39 F.3d 1182
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Matthew BARRENTINE and Dwayne Ferguson, Defendants-Appellants.
 Nos. 93-2077, 93-2078.
 United States Court of Appeals, Sixth Circuit.
 Nov. 2, 1994.
 
 Before: MARTIN, SUHRHEINRICH, and DAUGHTREY, Circuit Judges.
 PER CURIAM.
 
 
 1
 The defendants, Dwayne Ferguson and Matthew Barrentine, were each convicted of conspiracy to violate civil rights in connection with the destruction of the foundation of a home being built in an all-white section of Taylor, Michigan, by an African-American family. In addition, Ferguson was convicted of "interference and intimidation based on race or color, aiding and abetting" in connection with the same destructive act. On appeal, Ferguson and Barrentine both claim that the district court erred in enhancing their sentences based upon the vulnerability of the victims. Ferguson raises an additional issue contending that evidence of prior bad acts was improperly admitted at his trial, resulting in a conviction for his racist attitudes and tendencies rather than for the criminal acts alleged in the indictment. We conclude that the convictions should be sustained, but we remand for modification of the sentences imposed on both defendants.
 
 I.
 
 2
 In the summer of 1991, Calvin and Valerie Williams purchased a lot on Mary Street in Taylor, Michigan. During July of that year, the Williamses, an African-American couple, began construction of their home in the all-white neighborhood by having a foundation built with approximately 600 concrete blocks. Calvin Williams, accompanied by his four-year-old son, visited the property each day while construction was underway in order to check on the progress of the project.
 
 
 3
 On the evening of July 26, 1991, Chris Portis joined defendants Ferguson and Barrentine in conversation in the yard of Ferguson's home on Mary Street. Portis heard Ferguson declare, "They came down when I kicked them. They came down pretty easy when I kicked them." When asked about what he was speaking, Ferguson "said that--they said they didn't want 'niggers' living in the neighborhood and Matt [Barrentine] said, yes, he wouldn't want 'niggers' living across the street from you." At that time, Ferguson left the group, walked to a shed in his back yard, and returned carrying a sledge hammer and a claw hammer. The defendants then proceeded across the street to the Williams property while Portis remained near the roadway acting as a lookout. Although Portis could not see Ferguson and Barrentine through the trees and shrubbery, he "could hear some bricks breaking."
 
 
 4
 Eventually, the defendants returned from the Williams property with the hammers in their hands. When Portis inquired what they should say if anyone questioned them about their activities, one of the defendants responded, "Don't worry about that. Nobody wanted them here anyway."
 
 
 5
 The next day, Calvin Williams discovered that a person or persons had kicked over and smashed the concrete blocks that were to serve as the foundation of his new home. According to Williams, his son, who again had accompanied him on his daily visit to the property, was so distraught at the situation that the little child began to cry. The police were called to the scene and, in an attempt to cover his involvement, Chris Portis approached one of the officers to inquire what had happened. The officer responded "that someone had kicked over bricks off a black man's home."
 
 
 6
 In October 1991, Portis confessed his complicity in the crime to the FBI and detailed the defendants' participation in the events of July 26, 1991. About that same time, "three or four months" after the offense, Barrentine confided to Ward Bennett that he (Barrentine) had destroyed the foundation of the home, "him and a friend." Based in part on such evidence, federal charges were eventually brought against Portis, Ferguson, and Barrentine. Portis, however, entered a plea of guilty to the charges leveled against him and agreed to testify against the defendants at their trial in exchange for an agreement that the government would not oppose his request for probation.
 
 
 7
 At the trial of Ferguson and Barrentine, the prosecution offered evidence of Ferguson's dislike of African-Americans and of his attempts to keep all African-Americans from the neighborhood in which he lived. In order to establish that animosity, the government offered proof of threats of violence Ferguson had made to an African-American teenager who once dated a white girl who resided on Mary Street. Evidence was also adduced by Ferguson's 12-year-old cousin, Clinton Selders, and a friend of Selders, Tommy Collins, that shortly before the destruction of the foundation, Ferguson claimed "that he should wreck the foundation," that he "was going to smash that 'nigger's foundation," and that African-Americans had no right to reside in his neighborhood. Ferguson also admonished that "[i]f Tommy said anything, that he [Ferguson] would beat his little ass." Further testimony was offered that Barrentine also sought to silence witnesses against the defendants by threatening Portis with physical harm and by threatening to offer incriminating evidence against Ward Bennett's brother if the brother's girlfriend did not persuade Bennett not to testify against Barrentine.
 
 
 8
 The defendants offered an alibi defense and claimed that they had been with Ferguson's sister in the hospital during the time the foundation was destroyed. The jury chose not to believe the defendants' account of the evening of July 26, 1991, however, and convicted both men of conspiracy to interfere with civil rights. Ferguson was also convicted of aiding and abetting in intimidating and interfering with the Williams family in their enjoyment of protected activities because of their race and color.
 
 
 9
 The base offense level of 15 applicable to the crime of conspiracy to interfere with civil rights was enhanced two levels for each defendant based upon the vulnerability of the victims of the crime. Barrentine's offense level was increased an additional two levels, moreover, as a result of his attempts to obstruct justice by threatening adverse witnesses. Because of his prior criminal history, Barrentine was then sentenced to 40 months in prison and Ferguson was sentenced to concurrent prison terms of 27 months and 12 months.
 
 II.
 
 10
 In one issue, Ferguson submits that the district court erred in allowing the prosecution to introduce evidence of a prior bad act of the defendant. Specifically, Ferguson complains that the jury should not have been allowed to hear how, in April of 1991, he threatened Brian Winfrey, an African-American teenager who was then dating Megan Terry, a Caucasian teenager. According to the testimony at issue in this appeal, after Ferguson saw Winfrey visit Terry at a residence on Mary Street, the defendant, accompanied by Chris Portis and another individual, approached the home armed with a BB gun and shouted, "Send the nigger out.... He doesn't belong here. We're going to put him where he belongs."
 
 
 11
 Ferguson insists that introduction of this evidence was unduly prejudicial and that it should have been ruled inadmissible under Federal Rule of Evidence 404(b). He claims that as a result of hearing the testimony, the jury convicted him simply for being a racist, not based upon the evidence presented regarding the elements of the offenses with which he was charged. The government insists, however, that the conspiracy statute under which Ferguson was convicted requires proof of an intent to deprive an individual of the free exercise of a protected right and that evidence of the threats communicated to Winfrey was admissible to establish Ferguson's intent to prevent any African-Americans from living or visiting in his neighborhood.
 
 
 12
 In order to establish a conspiracy to deprive an individual of civil rights under 18 U.S.C. Sec. 241, the government must prove an intent "to injure, oppress, threaten, or intimidate any inhabitant of any State, Territory, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States...." Because a specific intent is thus an element of the offense itself, the prosecution must prove that intent beyond a reasonable doubt, regardless of whether the defendant contests the existence of that element. See, e.g., United States v. Hamilton, 684 F.2d 380, 384 (6th Cir.), cert. denied, 459 U.S. 976 (1982). It was in its attempt to establish such intent that the prosecution offered the testimony of Megan Terry and Brian Winfrey regarding the actions of Dwayne Ferguson in April 1991. Without their testimony, and that of other witnesses who described racist statements made by the defendants, the offense in this case would amount to no more than mere vandalism. See generally United States v. Franklin, 704 F.2d 1183, 1188 (10th Cir.1983) (prosecution under 18 U.S.C. Sec. 245(b)(2)(B), for interference with another's right to use a public facility because of race; held: proof of other racist acts admissible to show intent).
 
 
 13
 A district judge's decision regarding the admissibility of evidence under Fed.R.Evid. 404(b) is reviewed by this court under the deferential abuse of discretion standard. United States v. Khan, 969 F.2d 218, 222 (6th Cir.1992). In this case, the district court correctly concluded that the testimony regarding Ferguson's reaction to the visit of Brian Winfrey with Megan Terry was relevant to establish the defendant's intent and motive for the crimes with which he had been charged.
 
 
 14
 Furthermore, the district judge gave the jury a limiting instruction on how to evaluate the evidence of Ferguson's encounter with Brian Winfrey. The jury charge indicated that the jurors could consider the evidence of other bad acts only in deciding the defendants' motive, intent, or absence of mistake. In light of the relevancy of the evidence in proving an essential element of the offense charged, and in light of the efforts taken by the district judge to ensure that the testimony did not unduly prejudice the defendants, we conclude that there was no abuse of discretion in connection with the district court's decision to admit evidence of a prior bad act committed by Ferguson.
 
 III.
 
 15
 Both defendants contend that the district court erred in enhancing their sentences as a result of the vulnerability of one of the victims. In particular, the district judge concluded that the enhancement provided by U.S.S.G. Sec. 3A1.1 was proper "because of victim vulnerability, four-year-old child here who, you know, went with his parents, whether we like ... it or not, has probably had considerable exposure to what happened from the expressions, the feelings of the parents and their friends."
 
 
 16
 The defendants argue on appeal that the district judge had no evidence before him to indicate that Ferguson and Barrentine singled out the victims in this case because of the vulnerability of the four-year-old child. The government concedes that error was committed by the district court in relying upon the youth of the son of the homeowners as a basis for enhancing the defendants' sentences. The government argues, however, that the increased sentences may be affirmed by this court because the record on appeal establishes another ground for utilization of the victim-vulnerability provision of the Sentencing Guidelines. Specifically, the government contends that the victims of these crimes were singled out by the defendants precisely because the race of the victims, under the particular facts of this case, made the Williams family particularly vulnerable to the defendants' misdeeds.
 
 
 17
 In reviewing allegations of sentencing error, we must "accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. Sec. 3742(e). This court has concluded, as have other circuit courts, that a judgment of vulnerability for purposes of U.S.S.G. Sec. 3A1.1 "is a factual determination subject to the clearly erroneous standard." United States v. Salyer, 893 F.2d 113, 116-17 (6th Cir.1989), citing, United States v. Mejia-Orosco, 868 F.2d 807 (5th Cir.), cert. denied, 492 U.S. 924 (1989). See also, e.g., United States v. Callaway, 943 F.2d 29, 31 (8th Cir.1991). Thus, we must affirm the district court's finding of vulnerability unless a review of the record leaves the definite and firm conviction that a mistake has been made. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985).
 
 
 18
 Pursuant to the provisions of U.S.S.G. Sec. 3A1.1, a defendant's sentence offense level shall be increased by two levels "[i]f the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct." (Emphasis added.) The commentary to that guideline section further explains:
 
 
 19
 This adjustment applies to offenses where an unusually vulnerable victim is made a target of criminal activity by the defendant. The adjustment would apply, for example, in a fraud case where the defendant marketed an ineffective cancer cure or in a robbery where the defendant selected a handicapped victim. But it would not apply in a case where the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.
 
 
 20
 U.S.S.G. Sec. 3A1.1, comment. (n. 1). The vulnerable-victim enhancement is thus properly applied only when the defendant insists upon commission of criminal conduct despite knowing that a victim is unusually susceptible to such conduct, or if such susceptibility should have been known to the defendant.
 
 
 21
 The government concedes in this case that the district judge erred in applying the victim vulnerability enhancement based upon the youth of one of the victims (the four-year-old son of Calvin and Valerie Williams). The evidence before the district court gave no indication that Ferguson and Barrentine knew that a child would be victimized by their action. Although the young boy may have indeed suffered as a result of the defendants' callous actions, application of the provisions of U.S.S.G. Sec. 3A1.1 does not rest upon "the severity of the victim's suffering." United States v. Long, 935 F.2d 1207, 1211 (11th Cir.1991). Instead, the applicability of the enhancement provisions turns on the defendant's knowledge of the vulnerability of the victim. In the absence of evidence before the district court indicating that the defendants knew of the existence of the child of the victims, a reviewing court must necessarily be left with the "definite and firm conviction" that a mistake has been made in the sentencing determination. We conclude that the district court should not have enhanced the defendants' sentences based upon the youthfulness of the son of Calvin and Valerie Williams.
 
 
 22
 Despite that error, the district court is not necessarily required to resentence the defendants based upon lower offense levels. Throughout the sentencing proceedings in this case, the government advanced two rationales for use of the vulnerable victim provisions of the Sentencing Guidelines. Not only did the prosecution contend that the age of the child should result in sentence enhancement, but the government also maintained that the race and isolation of the victims in an all-white section of the Taylor community rendered the Williams family more vulnerable to attack. Moreover, evidence presented in the district court established that the defendants were aware of that social isolation and of the fact that no community members would attempt to stop the property crime or report the defendants' participation in it to the police. Consequently, the government, as the prevailing party, is entitled to defend the judgment of victim vulnerability rendered in its favor "on any ground properly raised below whether or not that ground was relied upon, rejected, or even considered by the District Court...." Washington v. Confederated Bands and Tribes of the Yakima Indian Nation, 439 U.S. 463, 476 n. 20 (1979).[1]
 
 
 23
 The district judge explicitly informed the parties that it was not considering the race of the victims as a factor in determining the vulnerability of the Williams family to this crime. There is, however, a strong argument to be made that such a ground could support enhanced sentencing under the provisions of U.S.S.G. Sec. 3A1.1.[2] Nevertheless, in the absence of findings of fact on this issue, this matter must be remanded to the district court for appropriate proceedings, findings of fact, and sentencing determinations. The government's alternative theory argument can be fully explored by the district court on remand.
 
 
 24
 For the reasons set out above, we AFFIRM the judgments of convictions in these cases but VACATE both sentences and REMAND the matter to the district court for resentencing.
 
 
 
 [1]
 In this case, even the attorney for defendant Barrentine recognized that two grounds for enhanced sentencing had been advanced by the government. During the sentencing hearing, the attorney questioned the district judge, "May I ask the Court, is the Court doing so because the Government has given two reasons: One would be that there is a child involve[d], and the second was that this crime was against or perpetrated because of race?"
 
 
 [2]
 Initially, it must be noted that "race is not 'built into' a violation of 18 U.S.C. Sec. 241." Salyer, 893 F.2d at 116. As this Court explained in Salyer:
 Although the civil right violated in the present case concerns race, 18 U.S.C. Sec. 241 does not assume that a victim of a civil rights conspiracy will be a member of a racial minority group. It could involve a conspiracy to deny interstate travel, or the right to procedural due process. The civil right denied could be on the basis of sex, national origin, or religion.
 Id. at 115-16 (citations omitted). Moreover, in this case, as was recognized by the Eleventh Circuit Court of Appeals in Long, 935 F.2d at 1212:
 [W]hen the race of the victim could reasonably give the appearance, in the light of other circumstances, of increased isolation on the part of the victim, so that a defendant could think that aid for the victim might be less available or slower in coming, race counts towards vulnerability.